UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | |
|---|---|
| TIMOTHY MUNRO ROBERTS,<br><br>Plaintiff,<br><br>vs.<br><br>UNITED STATES OF AMERICA;<br>COLLETTE PETERS, BOP Director;<br>YANKTON FPC WARDEN; DR. ROCK<br>BOYD, Jointly and Individually;<br>NAPHCARE, Jointly and Individually;<br>and ESTILL FPC, WARDEN,<br><br>Defendants. | 4:23-CV-04116-CCT<br><br><br>**ORDER** |

| | |
|---|---|
| TIMOTHY MUNRO ROBERTS,<br><br>Plaintiff,<br><br>vs.<br><br>UNITED STATES OF AMERICA; BOP<br>DIRECTOR COLLETTE PETERS;<br>YANKTON FPC, WARDEN; DR. ROCK<br>BOYD, Jointly and Individually;<br>NAPHCARE, Jointly and Individually;<br>and ESTILL, FPC, WARDEN,<br><br>Defendants. | 4:23-CV-04166-CCT |

Timothy Munro Roberts commenced two nearly identical lawsuits under

28 U.S.C. § 1331 and *Bivens v. Six Unknown Federal Narcotics Agents*, 403

1

U.S. 388 (1971). 4:23-CV-04116-CCT Docket 1; 4:23-CV-04166-CCT Docket 1. The Court consolidated the cases, and 4:23-CV-04116-CCT is the lead case. Docket 8. Mr. Roberts's case was screened pursuant to § 1915, and his claims against the United States and against Collette Peters, Yankton FPC Warden, and Estill FPC Warden in their official capacities were dismissed under 28 U.S.C. § 1915(e)(2)(B)(i-ii). Docket 9. His claims against NaphCare were dismissed without prejudice under 28 U.S.C. § 1915(e)(2)(B)(ii). *Id.* Only his Eighth Amendment *Bivens* and state-law medical malpractice claims against Dr. Rock Boyd survived screening. *Id.*

Dr. Rock Boyd answered, Docket 29, and filed the current motion, Docket 45, seeking summary judgment pursuant to Federal Rule of Civil Procedure 56 on Mr. Roberts's individual-capacity *Bivens* claim for deliberate indifference to medical needs and dismissal of Mr. Roberts's state-law medical malpractice claim pursuant to Rule 12(h)(3). Mr. Roberts objects. Dockets 57, 60.

On December 16, 2024, Mr. Roberts filed a motion to voluntarily dismiss his lawsuit without prejudice. Docket 62. He claimed that "the purpose of filing this action was never solely to achieve legal victory[;]" rather, he filed suit primarily "to bring attention to the systemic issues and failures in the Bureau of Prisons (BOP) healthcare system and to alert the Office of Inspector General and executive leadership to these serious matters." *Id.* at 1–2. He claimed he achieved the intended outcome of raising such awareness. *Id.* at 2. He then noted "the practical challenges of pursuing a lawsuit against the federal

2

government and its employees" with "the limited chances of success due to sovereign immunity and other legal hurdles." *Id.* He therefore requested the Court enter an order dismissing and terminating the case. *Id.*

Dr. Boyd did not file a response. On January 14, 2025, this Court issued an order denying Mr. Roberts's motion to voluntarily dismiss his lawsuit because Mr. Roberts did not obtain a stipulation signed by counsel for Dr. Boyd as required by Federal Rule of Civil Procedure 41(a)(1)(A)(ii). Docket 63. There being no subsequent joint motion to dismiss this matter, the Court now rules on the merits of Dr. Boyd's motion for summary judgment and motion to dismiss. Docket 45.

## BACKGROUND

Mr. Roberts was convicted of wire fraud in violation of 18 U.S.C. § 1343, and in either June 2017 or 2018, the United States District Court for the Middle District of Florida sentenced him to an 80-month prison term followed by 3 years of supervised release. Docket 47 ¶ 1; Docket 1-1 at 1. He was incarcerated at Federal Correctional Institute Estill (FCI Estill), and approximately a year after his arrival, he "experienced a severe incident while working out. [He] heard a loud bone break and felt intense pain in [his] sternum." Docket 1-1 at 1. An x-ray revealed that a prior injury did not heal properly. *Id.* He "was given cortisone injections and prescribed sulindac to address inflammation, with the advice to continue working out to strengthen the muscles." *Id.* "Despite following this advice, [he] continued to suffer severe

pain in [his] sternum, arm, back, spine, and shoulder blade." *Id.* at 2. He claims that he sought further care but was denied treatment. *Id.*

Mr. Roberts was transferred to the Yankton Federal Prison Camp (Yankton FPC) on February 26, 2020. Docket 47 ¶ 2; Docket 1-1 at 2. Dr. Boyd was the Clinical Director at the time of Mr. Roberts's arrival. Docket 47 ¶ 3. According to Dr. Boyd, "[a]ll inmate transfers are subject to an initial medical screening by a mid-level medical professional where they are assessed for any acute medical or infectious conditions." Docket 53 at 2; *see also* Docket 47 ¶¶ 4, 5. Dr. Boyd claims that he is notified if any issues are identified, and as it relates to Mr. Roberts, Dr. Boyd was not notified of any "acute medical conditions[.]" Docket 53 at 2.

Dr. Boyd's first medical examination of Mr. Robert occurred on May 5, 2020. *Id.* at 2; Docket 47 ¶ 9; Docket 1-1. Dr. Boyd claims Mr. Roberts complained mostly about right shoulder pain during the visit. Docket 53 at 2. Although not in refence to a specific time frame, Mr. Roberts asserts that Dr. Boyd "dismissed [his] concerns, claiming [he] had mental problems and that nothing was wrong." Docket 1-1 at 2. Mr. Roberts also claims that "[d]espite persistent pleas for treatment, [Dr. Boyd] physically assaulted [him], jerking [his] injured arm and shoulder and threatening [him] with a shot if [he] persisted." *Id.*

According to Mr. Roberts, it was only after a year of complaints that "Dr. Boyd finally ordered an X-ray[.]" *Id.* He contends that during the x-ray, the technician said that his "shoulder's position was severely out of place,

indicating major issues." *Id.* But, according to Mr. Roberts, Dr. Boyd

"continued to refuse [his] requests for an MRI and all forms of treatment." *Id.*

He also contends that when he asked for a copy of the x-ray, Dr. Boyd

"instructed the technician not to save it, only allowing it to be viewed on-

screen." *Id.* Finally, he alleges that "the warden and assistant warden fired the

records keeper in medical and personally shredded two truckloads of all

medical records." *Id.*

Mr. Roberts was released from prison in 2022. *Id.* He claims that he

thereafter "qualified for Medicaid and immediately sought medical attention to

confirm that [he] wasn't imagining the pain." *Id.* He refers to what he calls

"[t]he current doctor's summary" and claims it reveals he "requir[es] spine

surgery on c4-c7, labrum repair, cutting of the collarbone, and inserting a 4"

cadaver bone with an 8" titanium plate." *Id.* at 3. He also contends he has

meeting scheduled with a neurosurgeon "to address nerve damage in [his]

head." *Id.* In a supplemental filing, Mr. Roberts alleges that due to the violation

of his "civil rights and den[ial of][ medical treatment, making [him] lug 150lb

bags around, work, not give [him an] extra pillow pass and much more[,]" he

will need surgery to repair his C3, C4, and C5 near his neck; a shoulder

surgery four months after the first surgery; and another surgery to fuse C6–C7

four months after the second surgery. Docket 5 at 1. In a second supplemental

filing, Mr. Roberts claims that he had the first surgery, but a spinal fluid leak

occurred, and various complications have resulted. Docket 6 at 1. He also

asserts he was "unfairly denied treatment" for additional medical needs—including a hernia and bladder restriction. *Id.*

According to Mr. Roberts, Dr. Boyd's actions and inactions have caused him to "suffer from a loss of mobility" and he "endur[es] constant pain and immense suffering." Docket 1-1 at 3. He requests $6,000,000 for "fair and just compensation for the violation of [his] civil rights, medical malpractice, negligence, and physical and mental torture." Docket 1 at 3–4.

Dr. Boyd filed an answer denying Mr. Roberts's allegations and asserting the affirmative defense of qualified immunity. Docket 29. Mr. Roberts filed a motion to compel the disclosure of certain information, Docket 35, which was denied in part because discovery is improper until Dr. Boyd's defense of qualified immunity is resolved, Docket 40. Mr. Roberts filed a second motion to compel, Docket 41, which was also denied because the discovery request related to defendants dismissed during screening, Docket 42.

On September 23, 2024, Dr. Boyd filed this motion for summary judgment on Mr. Roberts's *Bivens* claim and motion to dismiss for lack of subject matter jurisdiction Mr. Roberts's state-law medical malpractice claim. Docket 45. Dr. Boyd filed a statement of undisputed material facts, personal declaration, and the declaration of Jarad Herbig. Dockets 47, 48, 49. Mr. Roberts filed oppositions to Dr. Boyd's motion, Dockets 57, 60, but he did not file a response to Dr. Boyd's statement of undisputed material facts.

Mr. Roberts filed a third motion to compel, requesting the Court order Dr. Boyd to provide more complete answers to Mr. Roberts's first set of

6

interrogatories. Docket 58. He also filed a motion to provide supplemental information in support of his claims. Docket 61. Dr. Boyd did not respond to these filings.

## DISCUSSION

### 1. Motion for Summary Judgment

Dr. Boyd asserts that Mr. Roberts has not presented sufficient facts to support a deliberate indifference claim because he has not shown a serious medical need or injury that was so obvious that a layperson would know Mr. Roberts needed treatment and has not shown "that Dr. Boyd knew of a specific serious medical need and deliberately disregarded the need." Docket 53 at 10. Relatedly, Dr. Boyd contends that he is entitled to qualified immunity as a matter of law because Mr. Roberts's "complaint fails to provide facts sufficient to establish a violation of a constitutional right[.]" *Id.* at 7. For these reasons, Dr. Boyd requests summary judgment on Mr. Roberts's Eighth Amendment deliberate indifference claim. *Id.* at 12.

In response, Mr. Roberts argues that there are material issues of fact in dispute on the question whether Dr. Boyd acted with deliberate indifference to his medical needs in violation of the Eighth Amendment. Docket 57, 60. In support, he directs this Court to the claims asserted in his verified complaint and subsequent filings. *Id.*; Dockets 1, 5, 6, 20, 25, 31, and 36.

### a. Legal Standards

### i. Summary Judgment

Under Federal Rule of Civil Procedure 56(a), summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The moving party can meet this burden by presenting evidence that there is no genuine dispute of material fact or that the nonmoving party has not presented evidence to support an element of its case on which it bears the ultimate burden of proof." *Finneman v. United States Dep't of Ag.*, 5:23-CV-05034-KES, 2024 WL 5158473, at *4 (D.S.D. Dec. 17, 2024) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)). The Court views the evidence and reasonable inferences therefrom in a light most favorable to the nonmoving party. *Id.* at *5.

However, "[t]o avoid summary judgment, the nonmoving party may not rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial." *Id.* (cleaned up). Here, Mr. Roberts's complaint is verified. Docket 1 at 4. Therefore, although the Court is not required to "plumb the record in order to find a genuine issue of material fact[,]" *Barge v. Anheuser-Busch, Inc.,* 87 F.3d 256, 260 (8th Cir. 1996), it will consider any specific, non-conclusory facts alleged in this document, *Roberson v. Hayti Police Dep't*, 241 F.3d 992, 995 (8th Cir. 2001) ("[T]he facts alleged in a verified complaint need not be repeated in a responsive affidavit in order to survive a summary judgment motion.").

8

However, under the District of South Dakota's Civil Local Rules of Practice, the party opposing "summary judgment must respond to each numbered paragraph in the moving party's statement of material facts with a separately numbered response and appropriate citations to the record." D.S.D. Civ. LR 56.1.B. The party "must identify any material facts on which there exists a genuine material issue to be tried." *Id.*

Importantly, "[a]ll material facts set forth in the movant's statement of material facts will be deemed to be admitted unless controverted by the opposing party's response to the moving party's statement of material facts." D.S.D. Civ. LR 56.1.D; *see also* Fed. R. Civ. P. 56(e)(2) (providing that the court can consider a fact undisputed when a party "fails to properly address another party's assertion of fact as required by Rule 56(c)"). Pro se litigants are not exempt from these rules. *Bunch v. Univ. of Ark. Bd. of Trs.*, 863 F.3d 1062, 1067 (8th Cir. 2017) (providing that the plaintiff's "status as a pro se litigant did not excuse her from following the local rules").

While Mr. Roberts filed pleadings opposing Dr. Boyd's motion for summary judgment, Dockets 57, 60, Mr. Roberts did not respond to Dr. Boyd's statement of undisputed material facts with separately numbered paragraphs and appropriate citations to the record. He also did not resist Dr. Boyd's motion for summary judgment by citing materials in the record, such as depositions, documents, affidavits, declarations, or interrogatory answers. *See* Fed. R. Civ. P. 56(c)(1)(A). Rather, he cites various motions or other pleadings he filed in the case, which contain unsupported allegations. Therefore, the

Court deems admitted the facts set forth in Dr. Boyd's statement of undisputed material facts. *See Joe v. Walgreens Co/ILL*, No. CIV 09-4144-RAL, 2010 WL 2595270, at *1 (D.S.D. June 23, 2010) (deeming defendants' statement of undisputed material facts admitted because pro se nonmoving party did not submit a statement of material facts or directly respond to defendants' statement of material facts).

### ii.    *Qualified Immunity*

"Qualified immunity shields public officials from liability for civil damages if their conduct did not 'violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Dillard v. O'Kelley*, 961 F.3d 1048, 1052 (8th Cir. 2020) (citation omitted). "To decide whether an official is entitled to qualified immunity, we conduct a two-step inquiry: (1) whether the facts, viewed in the light most favorable to the plaintiff, demonstrate a constitutional or statutory deprivation; and (2) whether the right was clearly established at the time." *Nieters v. Holtan*, 83 F.4th 1099, 1105 (8th Cir. 2023) (quoting *Webster v. Westlake*, 41 F.4th 1004, 1009–10 (8th Cir. 2022)). The court may consider the elements in any order, and if either is not met, then the official is entitled to qualified immunity. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (providing that courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand").

### b. *Mr. Roberts's Eighth Amendment Bivens Claim for Deliberate Indifference*

Mr. Roberts alleges Dr. Boyd's deliberate indifference to his serious medical need violated his Eighth Amendment right to be free from cruel and unusual punishment. Docket 1. "[D]eliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain,' proscribed by the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)). "This conclusion does not mean, however, that every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment." *Id.* at 105.

Rather, a plaintiff "must demonstrate (1) that [he] suffered objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those needs." *Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997) (citation omitted). Under this standard:

> [The medical need] must be "one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Schaub v. VonWald*, 638 F.3d 905, 914 (8th Cir. 2011) (citation omitted). And subjectively, a prison official must have "actually kn[own about], but deliberately disregarded" the need, *Dulany*, 132 F.3d at 1239, which is a mental state comparable to criminal recklessness, *see Leonard v. St. Charles Cnty. Police Dep't*, 59 F.4th 355, 360 (8th Cir. 2023).

*Beard v. Falkenrath*, 97 F.4th 1109, 1118 (8th Cir. 2024) (second alteration in original).

Importantly, "a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment." *Estelle*, 429 U.S. at 106. Rather, "a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Id.* When reviewing whether the defendant deliberately disregarded a serious medical need, a court considers the defendant's "actions in light of the information he possessed at the time, the practical limitations of his position and alternative courses of action that would have been apparent to an official in that position." *Letterman v. Does*, 789 F.3d 856, 862 (8th Cir. 2015) (quoting *Gregoire v. Class*, 236 F.3d 413, 419 (8th Cir. 2000)). The question is not answered "with hindsight's perfect vision." *Id.* (quoting *Jackson v. Everett*, 140 F.3d 1149, 1152 (8th Cir. 1998)).

Reviewing the evidence here, the Court does not doubt that Mr. Roberts suffered from ongoing pain in his shoulder and from other ailments for many years, including while he was incarcerated at Yankton FCP. However, there are multiple problems with Mr. Roberts's deliberate indifference claim against Dr. Boyd. First, Mr. Roberts's complaint and supplemental filings contain allegations regarding medical care, or the lack thereof, during his incarceration *at FCI Estill*, Dockets 1, 36, but Dr. Boyd had no contact with Mr. Roberts while he was incarcerated at FCI Estill. Therefore, Mr. Roberts's claims in that regard are not relevant to the question whether *Dr. Boyd* was deliberately indifferent to a serious medical need of Mr. Roberts.

12

Second, Mr. Roberts's *Bivens* claim against Dr. Boyd falls outside the three contexts in which the Supreme Court has recognized *Bivens* as a remedy. Those three contexts include an implied cause of action under the Fourth Amendment against federal officers based on an alleged warrantless search and seizure, *Bivens*, 403 U.S. at 389, 397, a Fifth Amendment claim for gender discrimination against a congressman for firing his female secretary, *Davis v. Passman*, 442 U.S. 228, 248–49 (1979), and an Eighth Amendment claim against federal prison officials for failure to treat an inmate's serious medical need that resulted in the inmate's death, *Carlson v. Green*, 446 U.S. 14, 24 (1980). *See Ziglar v. Abbasi*, 582 U.S. 120, 131 (2017) (recognizing that "[t]hese three cases—*Bivens*, *Davis*, and *Carlson*—represent the only instances in which the Court has approved of an implied damages remedy under the Constitution itself").

Third, even if *Bivens* does apply, Mr. Roberts has not demonstrated that he objectively suffered a serious medical need at Yankton FPC. While Mr. Roberts makes bare assertions that Dr. Boyd assaulted him and ordered the destruction of medical records, the crux of his deliberate indifference claim relates to his belief that Dr. Boyd delayed necessary treatment. Indeed, in his view, the medical records documenting the treatment he received after his release prove that Dr. Boyd was deliberately indifferent to his serious medical needs. But nothing in these records evinces that surgery or other treatment was immediately necessary or that the alleged delay in treatment caused him harm or changed the prognosis. *See Hancock v. Arnott*, 39 F.4th 482, 487–88

13

(8th Cir. 2022) (concluding that the plaintiff failed to establish a serious
medical need because medical evidence did not show that delay caused harm
or that injury required immediate surgery); *Holden v. Hirner*, 663 F.3d 336,
342–43 (8th Cir. 2011) (providing that "[a] prisoner alleging a delay in
treatment must present verifying medical evidence that the prison officials
'ignored an acute or escalating situation or that [these] delays adversely
affected his prognosis'" (quoting *Reece v. Groose,* 60 F.3d 487, 491 (8th Cir.
1995)).

Fourth, and last, assuming that Mr. Roberts presented sufficient facts to
show a serious medical need, he nevertheless has not demonstrated a genuine
issue of material fact that Dr. Boyd deliberately disregarded a serious medical
need of Mr. Roberts.[1] *See Dulany*, 132 F.3d at 1240 (noting the plaintiffs'
failure "to refute the medical records presented by the defendants
demonstrating that care had been provided"). When Mr. Roberts arrived at
Yankton FCP in February 2020, he did not exhibit "signs of distress or
emergency medical issues[.]" Docket 47 ¶ 6. And while he requested an extra
pillow in a March 11, 2020 email to Dr. Boyd because of "constant pain [] from
[his] prior injury of [his] rotator cuff and broken upper clavicle[,]" Docket 48-1,

---

[1] Mr. Roberts alleges in his verified complaint that Dr. Boyd physically assaulted him
during a May 5, 2020 examination, ordered the destruction of medical records, and
threatened him and told him that his issues were simply mental. Docket 1-1 at 2.
However, he did not substantiate these allegations "with sufficient probative evidence
that would permit a finding in the plaintiff's favor." *Davidson & Assocs. v. Jung*, 422
F.3d 630, 638 (8th Cir. 2005) (citation omitted). Therefore, these allegations are
insufficient to defeat summary judgment. *Mann v. Yarnell*, 497 F.3d 822, 825 (8th Cir.
2007) (providing that allegations must be supported "on more than mere speculation,
conjecture, or fantasy").

Dr. Boyd's denial of that request was based on his independent medical judgment. Therefore, such denial does not show a deliberate disregard for a serious medical need. *Dulany*, 132 F.3d at 1240 ("a prison doctor remains free to exercise his or her independent professional judgment" (citing *Long v. Nix*, 86 F.3d 761, 765 (8th Cir. 1996)).

Moreover, a review of the record reveals that when Mr. Roberts did request medical care for his shoulder, Dr. Boyd met in person with him multiple times, considered his complaints, conducted physical examinations, ordered an x-ray, prescribed physical therapy exercise and medication, and added him to the orthopedic chorionic care list. *See generally* Docket 47. Dr. Boyd first met with Mr. Roberts on May 5, 2020. Docket 47 ¶ 9, Docket 48-2. During the physical examination of Mr. Roberts's shoulder, Dr. Boyd "found that his shoulder was intact with no decrease in strength compared to the left shoulder." Docket 47 ¶ 11. Dr. Boyd "prescribed daily physical therapy of shoulder-strengthening exercises," gave him a handout of those exercises, "and recommended over-the-counter medication to manage his pain." *Id.* ¶ 12. Dr. Boyd advised Mr. Roberts that his pain resolution "would be gradual and would take a minimum of 6–8 months of targeted rehabilitation." *Id.* ¶ 13. Dr. Boyd also ordered that Mr. Roberts undergo an x-ray of his right shoulder. *Id.* ¶ 14. On September 1, 2020, an x-ray was taken of Mr. Roberts's right shoulder, and it showed no fractures, no joint misalignment, and no change from a right shoulder x-ray in August 2019. *Id.* ¶ 16.

Dr. Boyd met with Mr. Roberts again on September 22, 2020, for a "recheck of his right shoulder." *Id.* ¶ 17; Docket 48-4. Dr. Boyd asked Mr. Roberts about the rehabilitation exercises prescribed during the May 2020 visit, and Mr. Roberts told Dr. Boyd that he "quit doing the prescribed exercises because they caused the implant in his jaw to hurt." Docket 47 ¶ 18; Docket 48-4. Dr. Boyd conducted another physical examination, assessing Mr. Roberts's range of motion. Docket 47 ¶ 19. He also conducted a Neer's test for impingement. *Id.* ¶ 20. The Neer's test showed that the right shoulder was positive for impingement, and the physical examination revealed Mr. Roberts had "some atrophy in the right shoulder compared to the left" and that he "had mild discomfort with some maneuvers, but no evidence of weakness or asymmetry[.]" *Id.* ¶¶ 19, 20. Dr. Boyd diagnosed him with tendonitis of the rotator cuff. *Id.* ¶ 22. He did not believe Mr. Roberts needed surgery; rather, he determined that rehabilitation would be the proper treatment under the circumstances, and he advised Mr. Roberts of this plan. *Id.* ¶ 21.

The day after Mr. Roberts's September 22, 2020 medical visit, Dr. Boyd reviewed Mr. Roberts's internal medical chart and outside medical records. *Id.* ¶ 23. The outside medical records revealed that Mr. Roberts had been diagnosed with bipolar disorder. *Id.* ¶ 24. The internal records revealed that Mr. Roberts made over 30 requests to the Yankton FPC Health Services Department in three months. *Id.* ¶ 25. Those requests included complaints about his dental implants, shoulder, and neck. *Id.* In regard to his dental implants, the internal records contained an oral surgeon's note that Mr.

16

Roberts's gums were healthy, and no action was advised for the implant. *Id.* Dr. Boyd determined based on Mr. Roberts's commissary purchases, he was consuming approximately 1.5 tablets of ibuprofen daily. *Id.* After reviewing these records and based on Mr. Roberts's behavior, Dr. Boyd requested a psychiatric consult. *Id.* ¶ 26.

Dr. Boyd did not see Mr. Roberts again until March 19, 2021, although Mr. Roberts was seen by other mid-level providers. Docket 48 ¶ 10; Docket 47 ¶ 27. During the March 19 appointment, Mr. Roberts complained "of pain on the right side of his face that ran down to his neck, shoulder, and hip." Docket 47 ¶ 27. Mr. Roberts told Dr. Boyd that his right shoulder hurts all the time and that "he does not do the rehabilitative exercises because they are painful." *Id.* ¶ 28. Dr. Boyd sensed that Mr. Roberts was agitated; Mr. Roberts said that nothing was being done for him. *Id.* ¶ 29. He was also argumentative at times. *Id.* ¶ 31. However, according to Dr. Boyd, Mr. Roberts "calmed down and was respectful by the end of the examination." *Id.*

"Dr. Boyd noted that even though [Mr.] Roberts stated that he was taking 6–8 ibuprofen each day, his commissary purchases show that he has not made any pain reliever purchases in the last six months." *Id.* ¶ 30. He also noted his concern about Mr. Roberts's mental health because his "agitation and some of his symptoms, which are not physically likely, seem to be amplified by his mood." *Id.* ¶ 33. Ultimately, "Dr. Boyd prescribed sulindac for pain control and added [Mr.] Roberts to the orthopedic care list for the pain in his face, neck, and shoulder." *Id.* ¶ 32.

Mr. Roberts was seen again by Dr. Boyd on April 7, 2021, this time for anxiety and poor sleep. *Id.* ¶ 34. Mr. Roberts requested Zoloft, and after Dr. Boyd discussed the side effects with him, especially because of Mr. Roberts's history of bipolar disorder, Dr. Boyd prescribed Zoloft. *Id.* ¶¶ 36–37. Approximately two weeks later, Dr. Boyd saw Mr. Roberts because he was having trouble sleeping and the Zoloft was "making him 'cloudy headed.'" *Id.* ¶ 39. He reported to Dr. Boyd that he was taking half of his tablet two times a day and that it helped his anxiety and that his neck pain decreased. *Id.* ¶ 40.

On April 27, 2021, Dr. Boyd saw Mr. Roberts for a follow-up visit regarding his use of Zoloft. *Id.* ¶ 42. Mr. Roberts relayed that he was still splitting his medication. *Id.* ¶ 44. He also stated that although "he still gets racing thoughts[,]" the medicine helped and his neck and shoulder have improved. *Id.* ¶ 43. Dr. Boyd decided to maintain the current medication dosage and informed Mr. Roberts that he could send a request to increase the dosage if he continued to improve after five to six weeks but did not feel a full response. *Id.* ¶ 46. According to Dr. Boyd, Mr. Roberts agreed with this plan. *Id.* ¶ 47. Dr. Boyd did receive a request to increase Mr. Roberts's dosage on May 11, 2021, and after reviewing Mr. Roberts's medical records, Dr. Boyd increased the dosage. *Id.* ¶¶ 48–49. Dr. Boyd retired in May 2021, and, thus, did not provide Mr. Roberts any further care. *Id.* ¶ 50.

There is nothing in the records cited above that suggests that Dr. Boyd's treatment of Mr. Roberts was "so inappropriate as to evidence intentional maltreatment or a refusal to provide essential care." *Dulany*, 132 F.3d at 1240–

18

41. Moreover, Mr. Roberts's personal feeling that he did not receive adequate treatment is not enough to create an issue of fact in dispute. *Id.* at 1240. Indeed, "[p]risoners do not have a constitutional right to any particular type of treatment." *Long*, 86 F.3d at 765; *Langford v. Norris*, 614 F.3d 445, 460 (8th Cir. 2010) ("[M]ere disagreement with treatment decisions does not rise to the level of a constitutional violation."). Also, although Mr. Roberts has since undergone medical treatment, including surgery, after being released from incarceration, more extensive treatment by a private health-care provider does not mean Dr. Boyd was deliberately indifferent to Mr. Roberts's medical needs. *See Logan v. Clarke*, 119 F.3d 647, 650 (8th Cir. 1997) (concluding that the defendants' efforts "while perhaps not as extensive as those a private health-care provider might have taken, did not reflect deliberate indifference to [the plaintiff's] medical needs"). This Court thus concludes that summary judgment is proper because even if *Bivens* were to apply, Mr. Roberts has failed to state an Eighth Amendment claim for deliberate indifference, and as such, Dr. Boyd would be entitled to qualified immunity.

### 2. *Motion to Dismiss*

Dr. Boyd argues that Mr. Roberts's state-law medical malpractice claim must be dismissed for lack of subject matter jurisdiction because the United States was dismissed as a party in the Court's screening order and because Dr. Boyd was, at all times relevant to Mr. Roberts's claims, acting within the scope of his employment as the Clinical Director at Yankton FPC. Docket 53 at 12–13. Dr. Boyd notes that the Federal Tort Claims Act (FTCA) is the exclusive

remedy for personal injuries caused by a negligent act or omission of a government employee acting within the scope of employment. *Id.* at 13. He further notes that a cognizable claim under the FTCA must be brought against the United States. *Id.*

While Mr. Roberts's supplemental filings refer to the FTCA, Dockets 31, 36, 57, 60, 61, his complaint does not allege a FTCA claim, Docket 1, and he did not indicate in his supplemental filings whether he intended to amend his complaint. Mr. Roberts also did not seek leave to amend his complaint to assert an FTCA claim against Dr. Boyd. *Rodgers v. City of Des Moines*, 435 F.3d 904, 910 (8th Cir. 2006) (affirming district court's refusal to consider allegations not pled in the complaint when plaintiff never sought leave to amend her complaint). Importantly, a plaintiff cannot amend a complaint in response to a defendant's motion for summary judgment. *N. States Power Co. v. Fed. Transit Admin.*, 358 F.3d 1050, 1057 (8th Cir. 2004) (explaining that parties are not entitle "to manufacture claims, which were not pled, late into the litigation for the purpose of avoiding summary judgment").

However, even if the Court considers Mr. Roberts's supplemental filings, a tort claim against Dr. Boyd under the FTCA would not withstand dismissal. Claims under the FTCA must be brought against the United States itself, not its officials. *F.D.I.C. v. Meyer*, 510 U.S. 471, 476 (1994). More significantly, Mr. Roberts admits that he filed his current suit without first presenting the claim to the appropriate federal agency, the Bureau of Prisons. Docket 31 at 3. The Eighth Circuit has "long held that compliance with § 2675(a)'s presentment

requirement is a jurisdictional precondition to filing an FTCA suit in federal district court." *Mader v. United States*, 654 F.3d 794, 805 (8th Cir. 2011). When, as here, there is no compliance with § 2657(a), there is no waiver of sovereign immunity, and the matter must be dismissed for lack of subject matter jurisdiction. *Id.* at 808; *see Eagle v. United States*, 5:22-CV-05083-RAL, 2023 WL 5978034, at *6 (D.S.D. Sept. 14, 2023) ("The FTCA waives sovereign immunity, but only if a plaintiff satisfies the procedural requirements of 28 U.S.C. § 2675(a) by presenting the claim to the proper federal agency.").

### 3. *Miscellaneous Motions*

Dr. Boyd filed a motion to stay discovery, Docket 50. Mr. Roberts opposed the motion. Docket 56. However, in light of the above rulings, this motion is now moot.

Mr. Roberts filed a motion to compel Dr. Boyd "to provide complete and non-evasive answers to" Mr. Roberts's first set of interrogatories. Docket 58 at 3. Dr. Boyd did not respond to this motion. However, whether and how Dr. Boyd responded to Mr. Roberts's first set of interrogatories is not evident from Mr. Roberts's motion because Mr. Roberts did not include a copy of Dr. Boyd's responses. Under the District of South Dakota's Civil Local Rules of Practice, "[a]ny portions of discovery materials necessary for the disposition of any motion filed (with relevant portions highlighted or underlined) must either be attached as an exhibit to the party's brief in support of such motion or attached to the party's affidavit filed with the brief." D.S.D. Civ. LR 26.1.C. Mr. Roberts also did not first engage in a good faith effort to resolve this discovery

dispute with Dr. Boyd prior to filing this motion. D.S.D. Civ. LR 37.1 (requiring a party to "file a separate certification describing the good faith efforts of the parties to resolve the dispute"); *see* Docket 40 (denying Mr. Roberts's motion to compel in part for his failure to comply with LR 37.1). Therefore, his motion to compel more complete answers is denied.

Finally, Mr. Roberts filed a motion to provide supplemental information to support his claims. Docket 61. He states that his "motion aims to furnish the Court with additional medical documentation and analysis essential for a complete understanding of the Plaintiff's injuries and the Defendants' alleged negligence." *Id.* at 1. He attached additional medical records to this motion and contends that "[t]hese records substantiate and expand upon the Plaintiff's allegations of prolonged negligence and its impact on the Plaintiff's physical and mental health." *Id.* at 2.

Under Federal Rule of Civil Procedure, "[o]n motion and reasonable notice, the court may, on just terms, permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented." Fed. R. Civ. P. 15(d). "In exercising its discretion, the court should also consider whether 'the proposed pleading is futile in that it adds nothing of substance to the original allegations or is not germane to the original cause of action.'" *Smith v. Brown*, 4:16-CV-04014-LLP, 2018 WL 1440328, (D.S.D. Mar. 22, 2018) (citation omitted). Mr. Roberts's motion does not add anything of substance to his claims against Dr.

Boyd; it merely seeks to add recent medical records to the docket. Therefore, Mr. Roberts's motion to supplement is futile and denied.

Accordingly, it is hereby

ORDERED that Dr. Boyd's motion for summary judgment and motion to dismiss, Docket 45, is granted. It is further

ORDERED that Mr. Roberts's Eighth Amendment deliberate indifference claim against Dr. Boyd is dismissed with prejudice, and his state-law medical malpractice claim against Dr. Boyd, Docket 1, is dismissed with prejudice. It is further

ORDERED that Dr. Boyd's motion to stay discovery, Docket 50, is dismissed as moot. It is further

ORDERED that Mr. Roberts's motion to compel, Dockets 58, is denied. It is further

ORDERED that Mr. Roberts's motion to provide supplemental information, Docket 61, is denied.

DATED March 12, 2025.

BY THE COURT:

/s/ Camela C. Theeler
CAMELA C. THEELER
UNITED STATES DISTRICT JUDGE